AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>The person of MICHELLE ALEXANDRA ESTEY | )<br>)<br>)<br>)<br>)<br>) |

Case No. 8:22-MJ-00635

(2nd AMENDED)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____   _____

*Judge's signature*

City and state:      Santa Ana, CA_____      _Hon. John D. Early, United States Magistrate Judge_

*Printed name and title*

AUSA: <u>Benjamin R. Barron (x3536)</u>

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## AFFIDAVIT

I, Braden Ballantyne, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since January 2021. I am currently assigned to FBI Los Angeles Division's Long Beach Resident Agency Domestic Terrorism squad, which investigates residents of the United States who commit violent criminal acts in furtherance of their political or social ideology. I have received training in physical surveillance, terrorism investigations, confidential source management, and electronic surveillance techniques. I have also received both formal and informal training from the FBI regarding electronic communications, and the use of the internet and digital devices in furtherance of crime. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a search warrant for the person of MICHELLE ALEXANDRA ESTEY (ESTEY) and an Apple iPhone 8 with IMEI 3560870907110931 and assigned call number 714-757-0424 (the SUBJECT PHONE) as described in Attachments A-1 and A-2, for the items to be seized described in Attachment B.

1

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>ITEMS TO BE SEIZED</u>

4.    The items to be seized are digital devices, relating to violations of 18 U.S.C. §§ 1752(a)(1), and (2) (Unlawful entry and disorderly or disruptive conduct in restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D), and (G) (Disorderly or disruptive conduct in Capitol Buildings or Grounds and illegal parading, demonstrating, or picketing in Capitol Buildings) (SUBJECT OFFENSES) as described in Attachment B.

### IV. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    As provided in further detail below, the investigation has revealed evidence that ESTEY unlawfully entered the U.S. Capitol Building on January 6, 2021. Based on information known to investigators, evidence of ESTEY's unlawful conduct is likely to be found on ESTEY's person and in her digital devices.

## V.  <u>**STATEMENT OF PROBABLE CAUSE**</u>

### *Background — The U.S. Capitol on January 6, 2021*

6.    U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.    The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.   On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.   On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.   As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.   At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

4

13.   At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.   Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.   At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.   Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others

5

in the crowd encouraged and assisted those acts.  Publicly
available video footage shows an unknown individual saying to a
crowd outside the Capitol building, "We're gonna fucking take
this," which your affiant believes was a reference to "taking"
the U.S. Capitol.



17.  Shortly thereafter, at approximately 2:20 p.m. EST,
members of the United States House of Representatives and United
States Senate, including the President of the Senate, Vice
President Mike Pence, were instructed to—and did—evacuate the
chambers.  That is, at or about this time, USCP ordered all
nearby staff, Senators, and reporters into the Senate chamber
and locked it down.  USCP ordered a similar lockdown in the
House chamber.  As the subjects attempted to break into the
House chamber, by breaking the windows on the chamber door, law

enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.  At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.  Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.  At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.  At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber.  Publicly available video shows an individual asking, "Where are they?" as they opened up the door

7

to the Senate Chamber.  Based upon the context, law enforcement
believes that the word "they" is in reference to members of
Congress.

22.  After subjects forced entry into the Senate Chamber,
publicly available video shows that an individual asked, "Where
the fuck is Nancy?"  Based upon other comments and the context,
law enforcement believes that the "Nancy" being referenced was
the Speaker of the House of Representatives, Nancy Pelosi.



23.  One subject left a note on the podium on the floor of
the Senate Chamber.  This note, captured by the filming
reporter, stated "A Matter of Time Justice is Coming."



24.   During the time when the subjects were inside the
Capitol building, multiple subjects were observed inside the
U.S. Capitol wearing what appears to be, based upon my training
and experience, tactical vests and carrying flex cuffs.  Based
upon my knowledge, training, and experience, I know that flex
cuffs are a manner of restraint that are designed to be carried
in situations where a large number of individuals are expected
to be taken into custody.





25.   At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

26.   At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.   At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.   Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.   Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.   Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

31.   Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

32.   Both chambers of Congress met and worked on the
Certification within the Capitol building until approximately
3:00 a.m. EST on January 7, 2021.

33.   During national news coverage of the aforementioned
events, video footage which appeared to be captured on mobile
devices of persons present on the scene depicted evidence of
violations of local and federal law, including scores of
individuals inside the U.S. Capitol building without authority
to be there.

34.   Based on my training and experience, I know that it is
common for individuals to carry and use their cell phones during
large gatherings, such as the gathering that occurred in the
area of the U.S. Capitol on January 6, 2021.  Such phones are
typically carried at such gatherings to allow individuals to
capture photographs and video footage of the gatherings, to
communicate with other individuals about the gatherings, to
coordinate with other participants at the gatherings, and to
post on social media and digital forums about the gatherings.

35.   Many subjects seen on news footage in the area of the
U.S. Capitol are using a cell phone in some capacity.  It
appears some subjects were recording the events occurring in and
around the U.S. Capitol and others appear to be taking photos,
to include photos and video of themselves after breaking into
the U.S. Capitol itself, including photos of themselves damaging
and stealing property.  As reported in the news media, others
inside and immediately outside the U.S. Capitol live-streamed

their activities, including those described above as well as statements about these activities.

36.   Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



[1]   https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





---

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

[3] https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

## Facts Specific To This Application

37.   On September 16, 2022, in the District of Columbia,
ESTEY was charged by complaint with 18 U.S.C. §§ 1752(a)(1), and
(2) (Unlawful entry and disorderly or disruptive conduct in
restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D),
and (G) (Disorderly or disruptive conduct in Capitol Buildings
or Grounds and illegal parading, demonstrating, or picketing in
Capitol Buildings). By way of summary, the affidavit in support
of the criminal complaint sets forth the following facts, among
others:

38.   According to records obtained through a search warrant
which was served on ATT, on January 6, 2021, in and around the
time of the incident, the cellphone associated with 714-757-
0424, an Apple iPhone 8 with IMEI 3560870907110931, was
identified as having utilized a cell site consistent with
providing service to a geographic area that included the
interior of the United States Capitol building.

39.   On May 24, 2022, I received a Federal Grand Jury
Subpoena from ATT pursuant to a Federal Grand Jury Subpoena
served to ATT on May 19, 2022. According to the Federal Grand
Jury Subpoena phone number 714-757-0424 is associated with Mike
Estey with billing address 14 Lucerne, Newport Beach, CA 92660.
According to California DMV records ESTEY's address is 14
Lucerne, Newport Beach, CA 92660. According to public source
database checks Mike Estey is the spouse of ESTEY.

40.   On May 24, 2022, I received a Federal Grand Jury
Subpoena from Amazon pursuant to a Federal Grand Jury Subpoena

15

served to Amazon on May 24, 2022. According to the Federal Grand
Jury Subpoena phone number 714-757-0424 is associated with
Amazon account registered to ESTEY. Address 14 Lucerne, Newport
Beach, CA 92660 is registered with the payment methods listed on
the account.

41.  On June 14, 2021, FBI received a tip via tips.fbi.gov
that "During a dinner with friends, who are loyal to the Trump
party, they revealed that their friend, Michelle Estey, was
amongst the people that stormed and entered the Capitol Building
on Jan 6th of this year. They told us they did not invite
Michelle to the dinner because of her radical political views
would clash with ours. Michelle Estey is married to Jim Estey,
they live in Newport Beach, CA and her Facebook page is as
follows: https://www.facebook.com/michelle.estey.9 The dinner
happened a few weeks ago, and I have been pondering to report it
as I have taken the oath to defend the U.S. to enemies foreign
or domestic. I am worried that my reporting could upset the
friendship with the people that invited us to dinner, or even
lead to retaliations".

42.  On December 7, 2021, I reviewed the YouTube video
entitled "D.C. Burning – Jan. 6th DC Riots". According to video
acquired through FBI investigation into Capitol Siege subject
Mariposa Castro, independent photojournalist Jeremy Lee Quinn
recorded video from inside room ST2M. At around 16 minutes and
15 seconds into the video a woman with blonde hair, a red,
white, and blue Trump beanie with '45' on the bill, a black
coat, holding a gray purse, and looking at a phone appears in

the video being captured inside the U.S. Capitol in room ST2M on
January 6, 2021. On September 10, 2021, I attempted to interview
ESTEY in person. ESTEY declined to speak without an attorney
present. It appeared to your affiant that the individual
described above in the YouTube video closely resembled ESTEY.



43.   On December 29, 2021, I interviewed a longtime family
friend of ESTEY. The picture below was presented. The family
friend identified ESTEY as the individual with blonde hair and
the Trump beanie in the picture.



A.    **USE OF DIGITAL DEVICES AT THE CAPITOL RIOTS**

44.  Based on my training and experience, I know that
individuals traveling outside of their cities of residence to
attend large events, such as the demonstration on January 6,
2021, in Washington D.C., typically carry their cell phones with
them in order to coordinate their travel plans, use web-based
applications to get directions to unfamiliar locations, and
communicate with friends and family both at the event and at
home.  Furthermore, based on my training and experience, I know
that persons who engage in the SUBJECT OFFENSES will frequently
use digital devices, including cell phones, computers, tablets,
and other devices, to conduct their criminal activities, take
(and store) photographs and videos in order to memorialize their
illegal activities, and maintain contact with others involved
with the planning, targeting, and execution of the SUBJECT
OFFENSES.

45.  In my training and experience, I know that smart
phones are the single most common way in which people now take
photographs and instantly share them with others.  As detailed
below, in my training and experience, camera and messaging
applications on smart phones allow users to take photographs and
video— such as those that were taken during the Capitol Riots -
and communicate with other users.

46.  Based on my review of public news reports following
the events at the U.S. Capitol on January 6, 2021, I know that
many individuals involved in the incident used their cell phones
to take photographs and videos, as well as to share them on

18

social media applications, both during and after the incident.
According to government and open source databases, ESTEY
previously maintained accounts on social media applications,
including Facebook and Twitter. I know, based on my training and
experience, that these Internet-based applications require
digital devices to operate and that photographs and videos that
are posted to social media are also generally stored on the
digital devices themselves.  Such evidence is therefore likely
to be found on the digital devices used by ESTEY.  These devices
are also likely to have other evidence of ESTEY's activities,
including evidence of her location in the hours and days leading
up to and after the Capitol Riots, Internet searches she
conducted regarding the riots, and communications with other
individuals regarding the riots.  These devices are also likely
to have other evidence of the commission of the SUBJECT OFFENSES
by other rioters who were near ESTEY while ESTEY recorded
activities at and near the Capitol.

47.  Accordingly, I believe that evidence of the SUBJECT
OFFENSES, including digital devices used by ESTEY to prepare
for, commit, document, and discuss the SUBJECT OFFENSES, are
likely to be found on ESTEY's person.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

48.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

---

[4] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    49.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

21

electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

50.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

22

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

       c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ESTEY's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ESTEY's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

51. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## VII. <u>CONCLUSION</u>

52.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute digital devices, relating to violations of 18 U.S.C. §§ 1752(a)(1), and (2) (Unlawful entry and disorderly or disruptive conduct in restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D), and (G) (Disorderly or disruptive conduct in Capitol Buildings or Grounds and illegal parading, demonstrating, or picketing in Capitol Buildings) will be found on ESTEY's person and the SUBJECT PHONE, as described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
_____, 2022.


_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

<u>PERSON TO BE SEARCHED</u>

The person of MICHELLE ALEXANDRA ESTEY, date of birth July 13, 1969, approximately 5'10" tall and approximately 175 pounds, with brown hair and blue eyes.  The search of MICHELLE ALEXANDRA ESTEY shall include any items on her person or within her immediate vicinity and control that are capable of containing items to be seized, including clothing pockets, digital devices, and containers (such as briefcases, backpacks, boxes, and purses).  The search shall not include a strip search or a body cavity search.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 1752(a)(1), and (2) (Unlawful entry and disorderly or disruptive conduct in restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D), and (G) (Disorderly or disruptive conduct in Capitol Buildings or Grounds and illegal parading, demonstrating, or picketing in Capitol Buildings) (the "Target Offenses") that have been committed by MICHELLE ESTEY ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

      a.    Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

      b.    Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

      c.    Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, *i.e.*, the certification process of the 2020 Presidential Election;

      d.    Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on

i

January 6, 2021, *i.e.*, the certification process of the 2020
Presidential Election;

     e.   Evidence relating to a conspiracy to illegally
enter and/or occupy the U.S. Capitol Building on or about
January 6, 2021;

     f.   Evidence concerning the breach and unlawful entry
of the United States Capitol, and any conspiracy or plan to do
so, on January 6, 2021;

     g.   Evidence concerning the riot and/or civil
disorder at the United States Capitol on January 6, 2021;

     h.   Evidence concerning the assaults of federal
officers/agents and efforts to impede such federal
officers/agents in the performance of their duties the United
States Capitol on January 6, 2021;

     i.   Evidence concerning damage to, or theft of,
property at the United States Capitol on January 6, 2021;

     j.   Evidence of any conspiracy, planning, or
preparation to commit those offenses;

     k.   Evidence concerning efforts after the fact to
conceal evidence of those offenses, or to flee prosecution for
the same;

     l.   Evidence concerning materials, devices, or tools
that were used to unlawfully enter the U.S. Capitol by deceit or
by force, including weapons and elements used to breach the
building or to counter efforts by law-enforcement, such as
pepper spray or smoke grenades;

m.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.   Evidence of the state of mind of the Subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

o.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

p.   Records and information that constitute evidence of identity, including but not limited to:

i.   clothing worn by the Subject, to include a red, white, and blue Trump beanie with '45' on the bill, a black coat, a gray purse;

ii.   clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

q.   Records and information, including but not limited to documents, communications, emails, online postings,

iii

photographs, videos, calendars, itineraries, receipts, and
financial statements, relating to:

       i.   Any records and/or evidence revealing the
Subject's presence at the January 6, 2021, riot;

       ii.  Any physical records, such as receipts for
travel, which may serve to prove evidence of travel of the
Subject to or from Washington D.C. from December of 2020 through
January of 2021;

       iii. The Subject's (and others's) motive and
intent for traveling to the U.S. Capitol on or about January 6,
2021; and

       iv.  The Subject's (and others's) activities in
and around Washington, D.C., specifically the U.S. Capitol, on
or about January 6, 2021.

2.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

3.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to

v

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the
device has expired) absent further court order.

       g.  The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

       h.  After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

     4.  The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

     5.  In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law enforcement is permitted to: (1) depress MICHELLE ALEXANDRA ESTEY's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MICHELLE ALEXANDRA ESTEY's face with her eyes open to activate the facial-, iris-, or retina-

viii

recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.